Filed 7/16/14  In re S.V. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S. V., a Person Coming Under the Juvenile Court Law. | B252402 (Los Angeles County Super. Ct. No. CK99249) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>E. P.,<br><br>        Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Marilyn Mordezky, Juvenile Court Referee.  Affirmed.

        Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

        _____

E. P. (Mother) challenges a juvenile court order establishing dependency jurisdiction over her son and removing him from her custody. The record reveals that Mother has abused her child for years, causing severe emotional damage. We affirm.

## FACTS

Mother's son S. was born in 2003. In May 2013, when S. was nine years old, he was detained from Mother and placed with his father, Roger V. (Father).

S. came to the attention of the Department of Children and Family Services (DCFS) in 2009, when a school reported him saying, "'I wish I was dead,'" "'I am dumb,'" and "'I want to die.'" During an activity in which children said what they want to be when they grow up, S. responded, "'I want to be dead when I grow up.'" S. "hits himself, with great force" and bangs his head on hard surfaces. He blurted out that Mother "'calls me names and hits me all of the time!'" Father acknowledged that S. has mental health issues and needs counseling. Mother refused to allow S. to have counseling. DCFS instituted a voluntary family maintenance program that included parenting classes and psychotherapy. A second referral in 2009 indicated that S. came to school unfed and has a history of wanting to hurt himself. The referral was closed because the family was already receiving services from DCFS.

In 2011, a third referral reported that S. "comes to school with many marks on his face." He disclosed that Mother "hits him all the time." When he defecates on himself, Mother makes him wash his clothing in the bathtub, "Russian Style." S. soils himself at school, though he is too old for this behavior. S. was "extremely scared" of Mother. The reporting party described Mother as "scary," and warned that S. may not speak to social workers if he knows Mother will find out. During an investigation, S. "admitted that his mother hits him often, yells at him and calls him bad words. The child was observed with a bruise on his cheek and he reported his mother slapped him with [an] open hand." The referral was closed when Mother left the country and sent S. to Minnesota.

In November 2012, a fourth referral indicated that S. "came to school late crying, and very upset" because Mother "slammed his head into the child's breakfast and pulled his hair from the plate of food." S. was "terrified." When interviewed at school by a

2

DCFS social worker, he "was very sad and had a flat affect," holding his head down and making no eye contact. He put his head on the table when asked what was wrong, and refused to talk "'because you are going to tell my mommy what I said and I will get in trouble.'" Later, he stated, "'my mom will hit or curse at me if I speak with the government.'" He revealed that Mother was upset with him that morning because he took his time getting ready for school. He would not disclose what happened at breakfast because he feared being removed from parental custody. He admitted that Mother "always yells at him" and prefers residing with Father, whose home is "'peaceful.'" S. was very worried and questioned the social worker about telling Mother what he reported. When the social worker asked for Mother's telephone number, S. "began to cry and begged [her] not to call his mother or he would get in trouble." S. "stated he is scared of his mother" but does not fear Father, who has never hit or cursed at him.

The school principal said that S. is "very emotional[,] cries during class and is always sad." He was crying and upset as he left Mother's car that morning. S. has a history of not reporting events, due to his concern about Mother's reaction.

S. admitted to Father that Mother pulled his hair and shoved his face in his food. "Father was not surprised to hear that the allegations consisted of physical abuse. Father stated that the child S. was suicidal in kindergarten." Though Father has not seen evidence of physical abuse, he noted that Mother likes to use domination. She yells at the child. Father tried to reassure S. that the "government workers" who talked to him would not send him to live with strangers. Father reported that S. was evaluated as having an "emotional disturbance." The family went into counseling, but Mother withdrew midway. The child "shuts down in the middle of classes and does not make eye-contact with the teachers nor does he respond to them."

The psychologist at S.'s school confirmed that the child was assessed as being "emotionally disturbed." However, his parents removed him from counseling. The child "cries in class, appears to be sad and has a hard time socializing with other peers. The child isolates himself and has anxiety if you mention contacting his mother about his behavior in school." The counselor met with S. after his teacher saw him crying

3

uncontrollably in class. He told the counselor that Mother "yelled and cursed him, [ ] grabbed the back of his head, pulled his hair and shoved his face into his breakfast." Mother has a history of verbal and physical abuse against S., and is "very explosive and 'crazy.'" S. is sweet, very bright, though very sad. He generally recants his statements about Mother. The counselor called Mother when S. "would pee on himself. Mother's response would be to let the child 'sit on his shit.'" The school is "very concerned" for S.'s mental health and emotional well-being; he has declined in his social and academic skills. It is difficult to speak to Mother because she is always yelling and screaming. Indeed, the counselor fears Mother and wanted her interview with DCFS to be confidential.

Mother denied the allegations when the social worker spoke to her in March 2013. Mother indicated that she was abused as a child and would never abuse S. She terminated S.'s counseling program at school because an outside therapist said the child no longer needed counseling. Mother told the social worker that she could obtain this report from S.'s school, and disagreed with the school's assessment that he needs counseling. Mother feels the boy is "fine."

After Mother's interview with DCFS, S. called Father, crying and requesting that Father take him from Mother's house. Mother was screaming at S. and calling him "bad words that he did not want to repeat." She was mad about the investigation, and thought S. had reported her. Mother refers to DCFS as the "government."

Mother was advised that S.'s school had no record of a report from an outside therapist saying that the child no longer needed counseling services. Mother did not respond to requests to attend a Team Decision Meeting at DCFS offices.

In April 2013, S.'s teacher told DCFS that she has been teaching for over 20 years, and based on her experience, she believes that S. needs counseling. He "is often sad, excessively angry and has a hard time socializing with his peers. The child has [a] difficult time processing information and will often shut down in class." She described him as "being very disturbed or bothered." The teacher asked Mother to reduce S.'s extracurricular activities due to his inability to cope.

4

The social worker concluded that Mother failed to provide S. with mental health counseling services; physically abused him by shoving his face in his breakfast and pulling his hair; and emotionally abused him by constantly yelling and cursing at him, detrimentally affecting his physical and emotional well-being. S. is sad and struggling at school. Mother denies all allegations and minimizes the child's need for mental health care. DCFS obtained a removal warrant for S. and detained him due to the "very high" risk of abuse and neglect.

Father declared that he is S.'s parent. He lived with S. from the time of the child's birth in 2003 until February 2006. Since then, he and Mother have had joint legal and physical custody of S. Father participates in S.'s school activities, and takes him to doctor's appointments and on family vacations. He has provided S. with food, clothing and shelter since the child's birth.

On May 3, 2013, DCFS filed a petition alleging that Mother caused serious physical harm; failed to protect S.; and caused serious emotional damage. The juvenile court found a prima facie case for detaining S. He was placed in Father's custody and Mother was authorized to have monitored visits.

A DCFS jurisdiction/disposition report filed on July 24, 2013, elaborates on prior referrals regarding S. In 2009, DCFS was notified about "the child's suicidal ideation." Though S. announced that "I want to die," he did not mention having a suicide plan or a weapon to carry out the act of suicide. S. was five years old at the time he made suicidal statements. Mother and Father went through an emotional divorce in 2009, which impacted S. and his mental health. The parents were exchanging S. daily. When S. came to school after visits with Mother, he was agitated, sad, unfocused, withdrawn and tardy to school. By contrast, when S. arrived at school after visiting Father, he was attentive, relaxed, energetic, happy and on time. The family was under a voluntary maintenance program from September 2009 to June 2010.

A DCFS investigator met with S. in June 2013. Initially, he was "very upbeat[,] smiling, sitting upright, making eye contact and speaking in an audible tone" as he discussed a recent vacation. He "also spoke about feeling safe and happy in [Father's]

5

care and custody." Father talks to S. when the child misbehaves; S. feels that he can discuss problems and feelings with Father.

When S. was asked about his life with Mother, his demeanor changed immediately. He turned away from the interviewer, slumped, bowed his head, ceased eye contact, and spoke inaudibly. He said, "my mom doesn't yell at me, hit me or curse at me. She doesn't call me names." S. did not respond when asked what happens when he gets in trouble with Mother. He said "that he feared he was going to be taken away from [Father]." S. recanted the "breakfast incident," saying that he lied and made it up because he was late for school. He also said he lied about being sad or scared. He did not recall meeting the DCFS social worker in November 2012, or disclosing that Mother hit or cursed at him. He denied calling Father after DCFS interviewed Mother, crying and begging to be picked up because Mother was screaming at him. Father questioned S. about his denials. After that, S. appeared to be "very uncomfortable" and would not engage with the interviewer.

Father was interviewed twice. Father recalled that S. expressed fear because Mother told S. that "government workers" were "going to take him away if he reported anything bad." Father tried to explain to S. that the social workers were there to protect him. Father reported that Mother has a domineering personality, and is litigious and intimidating. During their marriage, constant arguments affected his physical health and psychological well-being, so he filed for divorce. He believes that the combination of Mother's high expectations, domineering personality and S.'s sensitive nature contributed to the child's emotional problems.

Father described Mother's parenting style as "inappropriate" and acknowledged that her behavior and actions have distressed S. S. is very protective of Mother and is afraid to reveal what goes on in her home. In 2009, Mother became ill and told S. that she was going to die: Father thinks this led to S.'s suicidal ideation and emotional problems. Since S. was removed from Mother's custody, Father has not received calls from S.'s school about the child's behavior. Father added that Mother does not believe

6

that S. has any type of emotional disturbance or needs any services. Until the current DCFS investigation began, he was unaware how Mother's behavior impacted S.

DCFS attempted to reach Mother by e-mail, at her request. Mother replied that the court gave custody to Father, so DCFS should contact Father for interviews because "the child is no longer with me." The investigator detailed the allegations in the petition in a subsequent e-mail, and requested an interview to get Mother's response to the petition. Mother replied, in an e-mail, that all the allegations are false: there is no evidence of physical harm, and there are no records of severe mental problems or emotional abuse from a hospital or psychiatrist. After Mother was given monitored visitation by the court on May 3, 2013, she saw S. for 30 minutes on June 5, and for 10 minutes on June 6.

The school psychologist was reinterviewed in June 2013. She reported that S.'s outbursts have dissipated since he was removed from Mother's custody, but he still displays signs of emotional disturbance that need to be addressed through counseling. The child is intelligent, but cannot fully benefit from his education due to his unresolved mental and emotional problems. In her experience, S. discloses serious incidents of abuse by Mother, "accompanied by a significant level of emotional distress such [as] fear, anxiety and sadness. However, S. has a pattern of recanting his disclosures." The psychologist recalled Mother's inappropriate response to several incidents in which S. defecated on himself during school. S.'s school records reveal his history of physically assaulting peers, resulting in suspensions.

DCFS asked the court to sustain the allegations. It cited the trauma, abuse and neglect S. has suffered, resulting in signs of emotional distress, coupled with Mother's refusal to allow S. to participate in counseling. DCFS sought to limit Mother's educational rights, and expressed concern about the parents' failure to seek treatment for S.'s mental and emotional problems.

Mother testified at the jurisdiction hearing. She stated that S. was bullied by other children at school; she complained to the school, which created tensions between her and the staff. She denied telling school staff to let S. "sit in his shit" when he defecated on himself; however, as a punishment, "I made him wash his pants." Mother was unsure

7

why S. "pooped in his pants," but theorized that his diet was unstable because she served the boy kosher organic whole foods and Father feeds him salads because he is vegan.

Mother objected to S. being in an individualized education program and felt that they were being discriminated against. She did not feel that the therapy given in the program helped S. Mother said, "I don't really believe in therapy" because "therapy is about talking, and I believe in action. . . . [Y]ou have to define the problem. And when you define the problem, you have to take specific action . . . to resolve the problem, and not just talk[ ] about the . . . symptoms."

Mother enrolled S. in numerous extracurricular programs—karate, chess school, Russian language school, and cultural school—which absorbed 10 to 15 hours per week of S.'s time. Since Father took custody, S. is not involved in these activities. Mother conceded that "possibly [he] was a little bit overworked and little bit overwhelmed." The police and DCFS had previously accused her of not feeding S. As a result, Mother insisted that S. eat during the "breakfast incident." She had physical contact with his shoulder and admitted to using force. He cried after Mother pushed him. She denied screaming at S.

Mother denied ever physically abusing or cursing at S. If he told social workers that she hit him with objects, "He's probably not telling the truth. To my knowledge, I did not ever hit him with any other objects." Mother testified that she removed S. from the individualized education program because the school psychologist called Mother "crazy." However, she conceded that she only recently learned of the insult from reading the DCFS reports, and withdrew S. from the program long before she read the reports.

Mother denied yelling at S.; rather, "I've raised my voice." The difference is that yelling shows a complete loss of control. She admitted to yelling at S. once, after DCFS got involved, when she was very upset that S. lied about her hitting him. She conceded that accusing the child of lying may have an emotional impact on him. She clarified, "If the child says the truth, and I yelled at him, it will emotionally damage him. If the child has lied, and I confronted him, it will not. He will learn his lesson." By the same token, Mother agreed that "yelling at the child is not acceptable."

8

Mother discounted that S. was evaluated by professionals as having emotional problems. At most, "he was mildly depressed and he was sad." She believes she is partially responsible because she and Father had an acrimonious divorce in 2009. She described S. as sounding "not happy" on the telephone, but did not attribute it to his fear of her. The school's reports to DCFS arise from her "huge conflict with the school." Mother denied saying that an outside therapist assessed S. as being fine.

S.'s counsel joined with DCFS in asking for the petition to be sustained. Mother demonstrated anger and cruelty toward S., causing him to experience fear, apprehension and depression. Mother instructed him not to disclose abuse to social workers because it would get her in trouble. She failed to get S. the emotional help that he needs.

After taking the matter under submission, the court made its ruling on October 10, 2013. The court discussed the behavioral assessments done by S.'s school, and the child's anxiety and fear when interviewed by social workers. S. displayed mental and emotional problems, plus toilet accidents that Mother did not handle appropriately, as evidenced by her response when the school telephoned her to report that S. defecated on himself. The family has a history with DCFS dating back to 2009, when S. expressed suicidal thoughts, which is probative of current conditions. Mother's own testimony shows that she continues to minimize the child's issues and is unaware that her conduct increases S.'s anxiety, worry and depression.

The court dismissed the physical abuse counts, and sustained two counts: (1) Mother is unable to provide appropriate parental care for the child's mental and emotional problems. Remedial services failed to resolve the problem because Mother did not allow the child to participate in necessary treatment recommended by the school psychologist. Mother minimizes the child's mental and emotional problems. Mother's inability to parent the child endangers the child's physical health and safety and places him at risk of harm; (2) Mother emotionally abused the child by frequently yelling at him, calling him derogatory, demeaning and disparaging names, and engaging in inappropriate physical discipline, causing him to exhibit suicidal ideation, self-injurious behavior, anxiety, anger, depression and emotional distress. He has been assessed as having an

9

"emotional disturbance." He is afraid of Mother and does not wish to remain in her home due to the emotional abuse.

S. was declared a dependent of the juvenile court, which found that there is a substantial danger if S. were returned to Mother's custody, and no reasonable means to protect him without removal. He was placed in Father's care, under DCFS supervision. The court ordered reunification services. Mother may have monitored visitation. Mother, Father and S. were ordered to participate in counseling. Mother's counseling must address parenting and disciplinary techniques. Mother appeals.

## DISCUSSION

The disposition order is appealable. (Welf. & Inst. Code, § 395; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 196.)[1] "In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

### 1. Jurisdiction

The juvenile court may exercise dependency jurisdiction upon proof that "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." (§ 300, subd. (c).) Mother maintains that "no evidence" supports this finding.

When sustaining allegations under section 300, subdivision (c), the juvenile court cannot focus solely on the child's behavior and reactions, and must look at parental conduct to explain the child's emotional disturbance. (*In re Alexander K.* (1993) 14

---

[1]     All statutory references in this opinion are to the Welfare and Institutions Code.

10

Cal.App.4th 549, 559-560.) The sustained petition in this instance states that S. has an emotional disturbance resulting from Mother's frequent yelling at him, calling him derogatory names, and speaking to him in a harsh and abusive manner, coupled with inappropriate physical discipline. Evidence of past conduct may be used to establish dependency jurisdiction, to the extent that it is probative of current conditions. (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1438; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.)

The record demonstrates that S. is suffering serious emotional damage. A school psychologist expressed concern for S.'s mental health and emotional well-being because he is sad and has declined in his social and academic skills. An experienced classroom teacher observed that S. would "shut down" during class. He is "often sad, excessively angry and has a hard time socializing with peers." The school principal observed that S. is "very emotional, cries during class and is always sad." School records show that he has a history of physically assaulting his peers.

Beginning at age five, S. expressed a wish to be dead, hit himself with great force, and banged his head on hard surfaces in school. He spontaneously blurted out that Mother "calls me names and hits me all of the time!" This prompted DCFS intervention. Two years later, S. again disclosed to school staff that Mother "hits him all the time." He was "extremely scared" of Mother. S. soiled himself in school, though he was too old for such behavior. Mother responded to these toileting incidents with brutal indifference (by telling school staff to let him sit in his soiled clothing) or cruelty (forcing the child to wash the garments in a bathtub).

By 2012, S. was so terrified of Mother that he begged the social worker not to tell Mother that he was upset and crying uncontrollably in class. He revealed to the school counselor that Mother yelled and cursed at him, pulled his hair and shoved his face into a plate of food. The child's fear of Mother was prescient, because soon after the DCFS social worker interviewed Mother, she screamed and called S. "bad words that he did not want to repeat," provoking him to call Father to be rescued.

11

After S. was detained by DCFS and removed from Mother's custody by the juvenile court, S. was upbeat, smiling, making eye contact and speaking audibly. However, as soon as he was asked about life with Mother, his demeanor changed. He turned away, slumped, made no eye contact, and spoke inaudibly. He did not respond when asked what happens when Mother is angry with him.

Father acknowledged that Mother's behavior caused S.'s emotional distress. The school psychologist noted that S.'s outbursts dissipated once he was removed from Mother's custody, but he still needs therapy for the lingering emotional disturbance. When S. recounted incidents of abuse by Mother, his disclosures were "accompanied by a significant level of emotional distress such [as] fear, anxiety and sadness."

Mother thinks S. is "fine" and needs no counseling. She does not believe in therapy. The juvenile court could—and did—reject Mother's testimony that this dependency case is a plot against her by school administrators. Mother admitted that she forced S. to wash his pants as punishment for defecating on himself, and admitted to raising her voice at S. She admitted to using force during the "breakfast incident." She admitted that the child is depressed and sad. Mother's testimony supported the DCFS allegations, instead of refuting them.

The evidence amply supports the juvenile court's findings. Every one of the markers for serious emotional damage—severe anxiety, depression, withdrawal, and aggressive behavior—is presented here. It is clear that Mother caused S.'s emotional damage, given his manifest terror of her and marked improvement after being removed from her custody.

Jurisdictional findings need not be reviewed piecemeal "if the evidence supports the decision on any one of several grounds." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor *if any one of the statutory bases* for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged

statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773, italics added.)

Given the gravity of the sustained allegations in this case under section 300, subdivision (c), the court had to exert jurisdiction to protect S. Accordingly, we need not consider whether the findings under section 300, subdivision (b) are supported by the evidence.

## 2. Disposition

Mother contends that insufficient evidence underlies the juvenile court's determination that a substantial danger is posed to S.'s physical health, safety, protection or emotional well-being if the child is returned home, and that there is no reasonable means to protect him short of removal from her custody. (§ 361, subd. (c)(1).) The juvenile court "'has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.'" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532; *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) In making its determination, the court considers "a broad spectrum of evidence shedding light on the circumstances of the minor and his or her family." (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183.) The jurisdictional findings are prima facie evidence the child cannot safely remain in the home of the custodial parent. (§ 361, subd. (c)(1); *In re R.V.* (2012) 208 Cal.App.4th 837, 849.)

Mother describes herself as "a responsible parent who ensured her son had food, a nice home, extracurricular activities, and a solid education." She argues that "the only claim of abuse or neglect is the failure of Mother to ensure S. received counseling as recommended by the school." Mother has mischaracterized the sustained petition and the evidence.

One of the sustained counts is that Mother failed to provide appropriate counseling to address S.'s mental and emotional problems. The other sustained count relates to Mother's emotional abuse, frequent yelling at S., calling him derogatory, demeaning names and speaking to him in a harsh and abusive manner. Plus, she engaged in "inappropriate physical discipline." Mother's emotional abuse caused suicidal ideation,

13

injurious behavior, aggression, anxiety, anger, depression and distress. S. "is afraid of the mother and does not wish to remain in the mother's home."

During her interview with DCFS, Mother flatly denied that S. was suffering, describing the child as "fine." She falsely told the social worker that an outside therapist assessed S. as not needing counseling. Far from admitting fault when confronted with S.'s difficulties, Mother instead screamed at S. and called him names because she blamed him (not the school, a mandated child abuse reporter) for calling DCFS. This suggests that Mother is unable to admit there is a problem or cooperate with a case plan. Mother's voluntary cooperation with DCFS in 2009-2010 plainly did not improve Mother's behavior or parenting skills.

In her testimony, Mother adamantly rejected therapy as an option for S., even if her brief suggests that she is "agreeable to counseling accommodations." Mother has a history of removing S. from needed therapy, due to her opposition to it. Mother admitted to using force when trying to get S. to eat, to raising her voice, and obliging him to wash soiled clothing in a bathtub as a punishment, even while attributing "pooping in his pants" to dietary issues rather than willful misbehavior. She has no insight into the child's emotional distress, and minimizes his problems. Despite reading the DCFS reports about S.'s struggles in school, Mother still felt that the DCFS case arises from her conflict with the school, not from S.'s emotional problems, as manifested by toileting accidents, crying constantly, and "shutting down" to the point of being unable to respond to his teachers.

Parental failure to "acknowledge[ ] the inappropriate nature of [ ] parenting techniques and disciplinary methods" justifies a disposition removing the child from parental custody and a finding that no reasonable means to protect the child are available. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.) When child expresses fear of his mother, who tends to overreact to minor problems with anger or hostility, removal is proper to protect the child from the parent's abusive tendencies. (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 196.) It is no surprise that the juvenile court determined that Mother

14

needs to participate in services before she can provide S. with a safe home. (*In re R.V.*, *supra*, 208 Cal.App.4th at p. 849.)

Mother cannot acknowledge her inappropriate parenting techniques. In fact, she has never admitted to any problem at all, for herself or her child, a denial that flies in the face of the sustained jurisdictional findings. At disposition, Mother had not participated in any services to achieve insight into appropriate disciplinary methods, or learn communication skills that do not involve slinging verbal abuse at everyone—her child, her former husband, and school staff. She abandoned her child by failing to visit him after he was detained.

This is not a close case. There is "evidence of a strong potential for recurrence of the abuse. A primary purpose of the juvenile law is protection of the child." (*In re Jose M.*, *supra*, 206 Cal.App.3d at p. 1104.) S. has expressed fear and displayed terror of Mother for years. Outside Mother's custody, S. has started to thrive, ceasing to have outbursts at school and showing an upbeat attitude, so long as his life with Mother is not discussed. Ample evidence supports the juvenile court's disposition order removing S. from Mother's custody due to a substantial danger to his emotional safety and well-being if he remains in her home.

### DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

15